JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

National Retail Systems, Inc. and Keystone Freight Corporation

### DEFENDANTS

Markel Insurance Company

(b) County of Residence of First Listed Plaintiff  Bergen
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Henrico
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

Michael Conley, Esquire  267.338.1317
Offit Kurman, Ten Penn Center, 1801 Market Street,

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332

Brief description of cause:
Markel elected to intentionally breach the obligations owed to its policyholder National Retail and showed reckless indifference to the facts and the p

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
in excess of $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE  Honorable R. Barclay Surrick, J.

DOCKET NUMBER  17-0672

DATE
March 28, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Michael Conley

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 125 Chubb Avenue, Lyndhurst, NJ 07047 _____

Address of Defendant: _____ 4521 Highwoods Pkwy, Glen Allen, VA 23060 _____

Place of Accident, Incident or Transaction: _____ 125 Chubb Avenue, Lyndhurst, NJ 07047 _____

---

**RELATED CASE, IF ANY:**

Case Number: **17-0672**   Judge: **Hon. R. Barclay Surrick**   Date Terminated: **n/a**

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | | |
|---|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☒ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☒ | No ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☒ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☒ |

I certify that, to my knowledge, the within case ☒ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: **03/28/2022**     **/s/ Michael Conley**     **54142**

*Must sign here*

*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☑ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, **Michael Conley**, counsel of record *or* pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: **03/28/2022**     **/s/ Michael Conley**     **54142**

*Sign here if applicable*

*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **NATIONAL RETAIL SYSTEMS, INC.,** | : | |
| 125 Chubb Avenue | : | **CIVIL ACTION NO.:** |
| Lyndhurst, New Jersey 07047 | : | |
| | : | |
| **and** | : | |
| | : | |
| **KEYSTONE FREIGHT CORPORATION,** | : | |
| 125 Chubb Avenue | : | |
| Lyndhurst, New Jersey 07047 | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MARKEL INSURANCE COMPANY,** | : | **JURY TRIAL DEMANDED** |
| 4521 Highwoods Pkwy | : | |
| Glen Allen, VA 23060 | : | |
| | : | |
| **Defendants.** | : | |

---

## COMPLAINT FOR BAD FAITH

Plaintiffs, National Retail Systems, Inc., and Keystone Freight Corp. (collectively "National Retail"), by way of Complaint against Defendant, Markel Insurance Company ("Markel"), say:

## I. PRELIMINARY STATEMENT

1.      Policyholders purchase insurance coverage as a means of transferring risk with the full expectation that should a claim arise, the insurance company will promptly comply with its contractual obligation and pay the claim.

2.      Implicit in the relationship between a policyholder and insurer is that when an insurance company sells a policy it does so knowing that it is accepting a fiduciary obligation to

treat its policyholder fairly and knowing that it cannot put its financial interest above that of its policyholder.

3.     Under New Jersey law, these requirements of an insurance company are implicit in the long-recognized obligation that an insurance company must treat its policyholders with the utmost good faith.

4.     Here, National Retail purchased a Commercial Crime Policy from Markel that generally provides coverage for thefts of company property.

5.     Regrettably, Markel elected to intentionally breach the obligations owed to its policyholder National Retail and showed reckless indifference to the facts and the proofs submitted by National Retail by:

- Asserting a defense to coverage that it knew or should have known was not even debatably valid, as evidenced by the fact that in a summary judgment ruling Markel's denial of coverage was determined to be unlawful;

- Pursuing a litigation strategy that included making false representations as to the substance of evidence, asserting positions so frivolous that Markel was forced to withdraw them, attempting to use discovery such as requesting the personal tax returns of employees of National Retail for an unlawful purpose - all in an attempt to drive up litigation costs, weaken National Retail's resolve, and to attempt to gain a perceived advantage in settlement discussions;

- After having the Court determine that its sole basis for denying coverage was unlawful, post-litigation asserting a position as to damages that is contradicted by

its own pre-litigation claims investigation, based on facts it knew or should have known are false, and based upon misrepresentations of witness testimony; and

- Failing to pay even the amount of the damages it acknowledges are due National Retail.

6.      Markel's bad faith denial of coverage and its bad faith litigation conduct demonstrated that it placed its own financial interest above that of its policyholder by intentionally delaying the resolution of this claim.

7.      Insurance companies are required to maintain reserves[1] so that policyholders have some security that when it comes time to pay a claim, the insurance company has the funds available to do so.  As such, reserves are intended to protect policyholders.

8.      Insurance companies hold reserves and invest them with the interest they generate being a major source of income to the insurance industry.

9.      By way of example, Markel reports that over the last ten years it has averaged a 15.2% return on its investments.

10.     At the conclusion of its investigation into the amount of the loss suffered by National Retail, Markel valued the equipment stolen from National Retail at $696,900 and reserved $671,900 [the $696,900 valuation less a $25,000 deductible] to pay National Retail's loss.

11.     With a rate of return of 15.2%, Markel doubles the money held in reserves in approximately 4.9 years.

---

[1] Loss rreserves are "an estimate of the value of a claim or group of claims not yet paid. A case reserve is an estimate   of the amount for which a particular claim will ultimately be settled or adjudicated." https://www.irmi.com/term/insurance-definitions/loss-reserve

12.     By failing to pay this claim and by its repeated efforts to delay the resolution of this litigation, Markel has earned to date over $750,000 in interest on National Retail's money.

13.     In breach of its obligations, as set forth herein, Markel denied coverage for what was not a debatably valid reason, pursued a litigation strategy of delay and obfuscation taking positions it knew or should have known were not debatably valid, post-litigation asserting a new damages theory it knew or should have known is not debatably valid, and continuing to refuse to pay even the amount of damages it concedes is owed to National Retail.

## II.     <u>THE PARTIES</u>

14.     Plaintiffs National Retail Systems, Inc. and Keystone Freight Corporation are Delaware corporations with their principal places of business at 125 Chubb Ave., Lyndhurst, New Jersey 07047.

15.     Upon information and belief, Markel is a Virginia corporation with a principal place of business of 4521 Highwoods Pkwy, Glen Allen, VA 23060.

## III.     <u>VENUE AND JURISDICTION</u>

16.     The subject matter jurisdiction of this Court is based upon 28 U.S.C. §1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391, in that both parties transact business in this District and part of the events giving rise to this action occurred in this District.

IV.     **FACTUAL BACKGROUND**

**MARKEL COMMERCIAL CRIME POLICY FOR 2015-2016**

18.     Markel sold to National Retail a Commercial Crime Policy for the policy period August 1, 2015 to August 1, 2016 (the "Policy"), which provides coverage for, amongst other things, losses due to employee theft.

**THE THEFT OF NATIONAL RETAIL'S TRAILERS**

19.     National Retail is a trucking and logistics company.  As such, it maintains an inventory of 5000-6000 trailers located throughout the United States, including maintaining a trailer yard in North Carolina.

20.     On or about April 8, 2016, National Retail discovered that one of its trailers was located at a scrap yard owned by Salvage America, Inc. ("Salvage America") located near National Retail's North Carolina trailer yard.

21.     Upon investigation, it was established that Richard Allen, a now former National Retail employee, was stealing National Retail trailers and selling them to Salvage America.

22.     Despite the fact that all of the trailers owned by National Retail were clearly marked as belonging to National Retail or an affiliate, over approximately 12 months, Allen sold over 100 stolen trailers to Salvage America.

23.     In a subsequent interview with Allen, he admitted to taking the trailers to Salvage America, and admitted receiving the money.  He also stated that he split the money with a co-worker Brian Allison.

24.     The police were contacted, and Allison and Allen were taken into custody. Subsequently, Allison and Allen were charged with Larceny by Employee, Possession of Stolen

Goods, Conspiracy to Commit Larceny, and Fraud by False Pretense, all felonies.  Allison plead guilty to all of the charges and Allen entered a guilty plea pursuant to the *Alford* decision.

## NATIONAL RETAIL'S REQUEST FOR COVERAGE

25.     On or about April 2016, National Retail submitted a claim to Markel for the value of the stolen trailers (the "Claim").

26.     Upon submission of the Claim, Markel was required to fully investigate the facts and if it determined that there was no coverage, it was required to disclose all of the reasons for the denial and all of the facts that support the denial.

27.     Markel retained Engel Martin[2] to investigate the Claim on its behalf.  During the subsequent months, Engel Martin obtained documents from National Retail and third parties, interviewed National Retail's employees, and interviewed third parties, and toured the National Retail North Carolina yard and the Salvage America facility.

28.      On July 21, 2016, Markel denied coverage based on a Prior Acts Exclusion in the Policy.  Markel's denial did not assert any other reason or even potential reason for denying coverage.

29.     On November 18, 2016, National Retail wrote to Markel and asked Markel to identify facts it relied upon to support its denial and raising questions concerning the substance of the denial.

30.     Markel did not respond to National Retail's letter.

## V.   MARKEL'S BAD FAITH CONDUCT

### Markel's Bad Faith Denial of Coverage

---

[2] Engel Martin is a third-party insurance claim adjustment company used by the insurance industry to investigate and adjust claims.  (See https://www.englemartin.com/about-us/).

31.     To enforce its contractual rights, on or around February 14, 2017, National Retail filed suit against Markel in the matter <u>National Retail et al v. Markel Insurance Company</u>, United States District Court, Eastern District of Pennsylvania, No. 17-cv-672 (herein after the "Coverage Litigation").

32.     The Coverage Litigation included one count for Breach of Contract based upon Markel's unlawful denial of coverage.

33.     On March 7, 2017, Markel filed an Answer to the Complaint in which, like its letter denying coverage, cited to just one exclusion, the Prior Acts Exclusion, as the basis for its denial of coverage.

34.     On July 2, 2018, National Retail filed a summary judgment motion asking the Court to rule that as a matter of law, Markel unlawfully breached the terms of the Policy by denying coverage for the claim.

35.     In opposing the Motion, Markel's lead argument against coverage was not the sole reason for its denial set forth in its July 21, 2016 denial letter.  Instead, Markel asserted a new defense that pursuant to an **addition** to coverage called a Clients' Property Endorsement, the Policy National Retail purchased only provides coverage for the theft of property of a National Retail client, and that the employee theft coverage did not provide coverage for National Retail's property stolen by an employee. Markel's second argument was that the Prior Acts Exclusion barred coverage.

36.     A Clients' Property Endorsement is, as its name suggests, an addition to coverage that insurance companies sell that extends crime coverage to not only cover property of the policyholder that is stolen, but also to provide coverage for property of a customer that is stolen while in the possession of the policyholder.

7

37.     In responding to the never before asserted coverage defense based on the Clients'
Property Endorsement, National Retail set forth how Markel's new argument was contrary to the
underwriting and pricing of the Policy, contradicted by how the insurance industry trains its
professionals in interpreting crime policies, and contrary to how Markel markets its crime
coverage wherein it represents that policyholders should pay more for the Client's Property
Endorsement because it adds coverage.

38.     National Retail noted that: "This new argument raised by Markel is so devoid of
merit that it is inconceivable that anyone at Markel involved with the sale or underwriting of
crime coverage could have in good faith approved it as a defense in this matter."

39.     On August 7, 2018, Markel withdrew its spurious Clients' Property Endorsement
argument, stating that Markel found "the probative value of the Plaintiffs' extrinsic evidence to
be persuasive."  The "extrinsic evidence" that Markel found so persuasive included documents
from Markel's own underwriting file for the Policy, insurance training manuals, and Markel's
own advertising literature.

40.     As noted by National Retail, and as confirmed by Markel by it withdrawing the
argument, no one involved with the sale or underwriting of crime coverage could have in good
faith approved the Clients' Property Endorsement as a defense and Markel's assertion of the
defense was in reckless disregard of the facts.  As such, Markel knew or should have known that
its Clients' Property Endorsement defense did not constitute a debatable reason for a denial of
coverage and therefore was asserted in bad faith.

41.     As for Markel's only other defense - the Prior Acts Exclusion, on August 14,
2020, the Court determined that Markel's denial of coverage was a breach of the terms of the
Policy.

8

42.     In rejecting Markel's defense to coverage, the Court found:

- That had Markel intended to exclude coverage under the circumstances of this claim, it could have done so.

- That Markel easily could have included a provision stating that in cases of collusion, the theft is excluded when at least one of the conspirators is subject to the Prior Dishonest Act Exclusion.  Markel did not employ any such language.

43.     Markel knew or should have known that its Prior Acts Exclusion defense was not a debatable reason for a denial and, as such, was asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

**Markel's Bad Faith Post-Summary Judgment Damages Defense**

44.     Markel asserts that it is required to pay the costs to replace the stolen trailers with property of comparable materials and quality and used for the same purpose.

45.     As part of Markel's pre-litigation claims investigation, at the specific request of Markel, Engel Martin worked with representatives of National Retail to determine the value of the stolen trailers.

46.     As part of that process and in response to a request from Engel Martin, National Retail researched the used equipment market and located a trailer comparable to each stolen trailer.

47.     For each stolen trailer, National Retail provided the source documents from the used equipment market, which consisted of dozens of pages of printouts from a used equipment website showing the value of similar trailers for sale.

48.     The Engel Martin adjuster asked if "each trailer shown in the support you provided [the printouts] represent a similar trailer that was stolen" and asked if National Retail

could provide for each stolen trailer the "make, model, vin/serial (as available), age and

replacement cost pricing for the trailer."

49.         In response, National Retail stated:

*Yes Cory [the Engel Martin adjuster] that's why I ran the list that I gave
you from 1988 to 2008 I gave you a broad range of the trailers. now I do
have a list of the trailers that were stolen or scrapped by make and by
serial number and by year is that what you're looking for because I can
provide that.*

50.   To which the adjuster responded:

*Yes, please forward the make, serial number, and year – along with
estimated replacement cost pricing for each trailer and all of the
documentation to support the cost.*

*I know this is time consuming, but I appreciate it. Have a good evening.*

51.   Based upon this request by Engel Martin, National Retail prepared a spreadsheet

listing all of the information requested.

52.   Upon receipt of the spreadsheet, the Engel Martin adjuster responded that it was

"exactly what I needed."

53.   Following a call between the Engel Martin adjuster and representatives of

National Retail, the adjuster set forth his conclusion as to the amount of the Claim based upon

the information he requested and received from National Retail, stating:

*Conference call with Don Dolan and Gil Giacobbi [National Retail
representatives] to discuss claim - confirmed figures in schedule near
$700K for stolen trailers is correct. Still need to determine which have
not been scrapped yet and can be returned.*

54.   Having received the information from Engel Martin, the Markel Claims Examiner

assigned to the Claim wrote the following in Markel's internal "Claim Review Summary:"

***Damages/Injury Description***:

10

> *The independent adjuster at Engle Martin reports he received a list of trailers that were taken to Salvage America. The list was prepared by Chris Triolo of Salvage America and includes the date each trailer was scrapped. This schedule confirms 93 trailers with asset values of $604,450.00. There is a second schedule of 33 additional trailers for $92,450.00.*

55.     As a result of the review by Engel Martin, the Markel's Claims Examiner who authored the "Claim Review Summary" requested that her supervisor increase the loss reserves on the claim to the $696,900 figure used in the list, less the $25,000 deductible.  That request was approved.

### Markel's Change in Position

56.     Following the Court's ruling that Markel's coverage defense was as a matter of law a breach of the terms of the Policy, the Court asked the parties to advise as to any issues that remained for trial.

57.     In response, Markel took the position that its pre-litigation factual determination was wrong, asserting for the first time that the stolen trailers did not have a value of $696,900 but instead asserting that "*the purpose of the trailers was, in fact, waste,*" and thus had no value other than as scrap.

58.     Markel asserted that the value of the trailers as "scrap" was the amount the scrap yard paid for the stolen trailers - $82,270.45.

59.     While Markel represented to the Court that it "secured" evidence during its claim investigation to support this assertion that each of the stolen trailers was "waste," it failed to cite to any. Nowhere in the Markel claims file or the file of Engel Martin is it even suggested that any of the trailers that were stolen were "waste."

11

60.     Markel also represented to the Court that "former employees" of National Retail testified that "the purpose of the trailers was, in fact, waste." Markel's support for this factual assertion consisted of citing to two pages of deposition testimony from Allen and Allison – the two individuals who stole the trailers.

61.     However, in the deposition transcript cited by Markel to support this position, neither Allen nor Allison testified that the trailers were "waste" or that the trailers were scrap. What Markel cited to were in fact wholly irrelevant passages from the depositions.

62.     In apparent recognition that Allen and Allison would not testify that each trailer was "waste," after almost five years of litigation, Markel pivoted, contriving a new argument that the scrap yard owner who received the stolen property was an "expert" who could testify as to the value of the trailers.  Markel did not provide an expert report, did not provide the opinion of its new "expert," and did not provide the facts upon which the new "expert" relied.

63.     At the time Markel represented that the scrap yard owner who received the stolen property was an "expert," it knew or should have known that the scrap yard owner could not testify as to the value of the trailers as compared to ones of "comparable materials and quality and used for the same purpose," as Markel states is required under the valuation provision of the Policy.

64.     In taking the position that every trailer that was stolen was "waste" and therefor had no value other than as scrap, Markel ignored that:

- Its adjuster had valued each stolen trailer based upon its market value in the used equipment market and not as "waste";

- Every stolen trailer was registered and roadworthy;

12

- Markel had the maintenance records for most of the stolen trailers showing that National Retail was paying for maintenance and repairs for the trailers, often just days before they were stolen;

- Every stolen trailer was driven to the scrap yard;

- Markel has pictures of stolen trailers showing they were functioning trailers and not "waste;"

- The scrap yard's owner testified that stolen trailers they purchased had new tires, rims, and brake drums;

- The scrap yard owner testified that the trailers were "functioning trailers;" and

- At the time the thefts were discovered, the scrap yard was in the process of painting over the logo on a National Retail trailer sitting in its yard, something it would only want to do if it intended to resell the stolen trailer.

65.    In addition, Markel's new assertion that the "purpose" of each of the stolen trailers was "waste," ignores the fact that trailers that were stolen were not scrapped by the scrap yard. At the time the thefts were discovered, the scrap yard had National Retail trailers at its facility and Salvage America was able to retrieve trailers it had sold.

66.    National Retail knew or should have known that stolen trailers returned to National Retail by Salvage America continue to this day to haul cargo.  As such, even after close to six years have passed since they were stolen, the "purpose" of these trailers continues to be to haul cargo and not as "waste."

67.    Markel knew or should have known that its new defense that the trailers were all "waste" was not a debatable reason for a denial of payment and this argument demonstrates

reckless indifference to the facts and to the proofs submitted by National Retail.  As such, Markel's change in position as to damages was asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

### Markel's Bad Faith Litigation Conduct

68.     As part of its bad faith litigation strategy, Markel filed baseless motions, served discovery requests it knew or should have known were in violation of the Federal Rules of Procedure, unlawfully disclosed confidential settlement communications and statements made by mediators during settlement conferences, unlawfully filed settlement offers with the Court, and served abusive discovery on National Retail, all so devoid of merit that they can only be viewed as an effort by Markel to delay, obfuscate, harass, and attempt to drive up National Retail's litigation costs.

69.     Upon being served in the Coverage Litigation, Markel's first tactic was to attempt to delay the matter by seeking to have it transferred from the Eastern District of Pennsylvania in Philadelphia, across the bridge to New Jersey.

70.     The basis for the Motion as asserted by Markel was that Philadelphia, the location chosen by National Retail, was not convenient for **National Retail**. In filing the Motion, Markel did not cite to any evidence that any events giving rise to the Coverage Litigation occurred in New Jersey.

71.     At the time Markel filed this Motion, it knew or should have known that its Motion to Transfer lacked both a legal and factual basis.

72.     On April 17, 2017, the Honorable R. Barclay Surrick, J. denied Markel's Motion to Transfer.

14

73.     As part of its determination that Markel's Motion lacked merit, with regard to Markel's assertion that New Jersey was the more convenient forum, the Court stated "We reject this argument."

74.     The Court also found that "Markel has failed to offer any facts suggesting that any events that gave rise to this litigation took place in New Jersey."

75.     Markel breached the obligation of good faith and fair dealing it owed to National Retail by filing its motion with the intent to delay the Coverage Litigation, increase National Retail's costs of litigation, and attempt to weaken National Retails resolve in pursuing its claim in the Coverage Litigation.

76.     Markel was required to complete any investigation into the claim prior to making a coverage determination and was also required to include in any coverage determination any and all facts that support that determination.

77.     Between April 2016 and July 2016 Markel employed Engel Martin to investigate National Retail's claim. Engel Martin spoke with National Retail employees, spoke with third parties, and obtained documents from National Retail and third parties.

78.     At no point did Engel Martin or Markel advise National Retail that it could not complete its investigation because it lacked sufficient information relating to the Claim.

79.     Markel's denial of coverage did not include any assertion that it was unable to obtain information needed to complete its coverage analysis.

80.     Once litigation ensued, Markel repeatedly took the position that it needed additional information in order to complete its assessment of coverage.

81.     During the litigation, despite F.R.C.P 33 limiting the number of Interrogatories to 25, Markel served over 60 interrogatories including sub-parts.

15

82.     During the litigation, despite F.R.C.P 30 limiting the number of depositions to 10, Markel noticed 13 depositions.

83.     During the litigation, Markel served dozens of document requests on National Retail including outlandish requests such as demanding that National Retail produce:

- All "tax filings" of National Retail, their affiliates, **and their owners**;

- All lawsuits against National Retail, their affiliates, **and their owners**;

- All "filings with federal and state agencies" by National Retail and its affiliates;

- All "bank records" of National Retail and their affiliates;

- All documents "relating to payroll (including but not limited to, any federal or state tax records relating to the payment of federal and local taxes on behalf of employees) and to any other employee benefits (including, but not limited to, health benefits, retirement benefits, etc.) provided to employees of Precision Werks, National Retail Systems, Inc. and Keystone Freight Corporation from 2003 through 2005;" and

- The personnel files of hundreds of employees;

84.     Markel was forced to withdraw or significantly limited these requests.  As to the last two categories, when Markel attempted to intimidate National Retail by filing a motion to compel their production, the Court noted that "Markel has not established the relevancy or proportionality," that Markel's Document Requests were "problematic," and that Markel "has not explained why it believes those files contain relevant information."

85.     In addition, Markel also served sixty-three (63) Requests to Admit.

86.     At no point prior to its coverage determination did Markel indicate that it needed any of the information it sought in discovery.

87.     When Markel attempted to support some of its more outlandish discovery requests, its response was that it needed the information not to confirm what it believed was a lawful denial of coverage, but instead so that it could attempt to establish that there was a "reasonable basis" for its denial of coverage and actually cited to bad faith caselaw to support its need for the discovery requested.   Markel knew when it was serving this discovery that it was not intended to confirm its denial of coverage, but only so that in post-litigation it could attempt to argue that it had a "reasonable basis" to deny coverage, presumably because it anticipated this bad faith claim.

88.     Markel and National Retail participated in mediations conducted by Magistrate Judges.

89.     A fundamental underlying tenet of any mediation is that any and all communications made as part of the mediation are confidential. This confidentiality requirement is codified in State and Federal statutes and specifically included in the Local Rules for the United States District Court for the Eastern District of Pennsylvania.

90.     Despite this confidentiality obligation, on multiple occasions Markel disclosed settlement communications, including the amounts of offers conveyed during a confidential mediation and by unlawfully filing an unaccepted offer of proof with the Court in violation of the Federal Rules of Civil Procedure.

91.     Markel knew or should have known that it could not disclose confidential settlement communications and settlement offers to the Court, but it did so as part of its bad faith litigation strategy.

**Markel's Bad Faith Refusal to Pay Even Its Post-Summary Judgment Value of the Loss.**

92.     Following the Court's determination that Markel had unlawfully denied coverage for the Claim, Markel asserted that each trailer was "waste" and, as such, the only value each trailer had was as scrap.

93.     Markel represented that the value of the stolen trailers as scrap was the amount the scrap yard paid for the stolen trailers - $82,270.45.

94.     Markel has failed to pay even that amount of damages.

95.     Markel's failure to pay the $82,270.45 is in violation of New Jersey law in that it is unlawful for an insurer to refuse to pay an amount it concedes as due in an attempt to influence settlement of the larger claim.

96.     Markel knew or should have known that there is no debatable reason for its refusal to pay and, thus, its failure to pay is in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

**Count 1 – Bad Faith Denial of Coverage**

97.     National Retail incorporates herein by reference the proceeding paragraphs.

98.     Markel knew or should have known that its Prior Acts Exclusion defense was not a debatable reason for a denial and, as such, was asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

99.     Markel knew or should have known that its Client's Property Endorsement defense was not a debatable reason for a denial and, as such, was asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

18

100.    In asserting the Prior Acts Exclusion and Client's Property Endorsement defenses, Markel demonstrated reckless indifference to the facts and the proofs submitted by National Retail.

**WHEREFORE**, National Retail demands judgment in its favor against Markel for compensatory damages, legal costs in the Coverage Litigation, putative damages, costs of suit, and such other relief as the Court deems just and proper.

### Count 2 – Bad Faith Post-Summary Judgment Refusal by Markel to Pay the Claim Based Upon its Assertion that the Stolen Trailers were All "Waste"

101.    National Retail incorporates herein by reference the proceeding paragraphs.

102.    Markel knew or should have known that its refusal to pay the Claim based upon its factual assertion that every trailer that was stolen was "waste" was not a debatable reason for a refusal to pay the Claim and, as such, was asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

103.    In asserting that every stolen trailer was "waste," Markel demonstrated reckless indifference to the facts and the proofs submitted by National Retail.

**WHEREFORE**, National Retail demands judgment in its favor against Markel for compensatory damages, legal costs in the Coverage Litigation, putative damages, costs of suit, and such other relief as the Court deems just and proper.

### Count 3 – Bad Faith Litigation Conduct

104.    National Retail incorporates herein by reference the proceeding paragraphs.

105.    Markel's bad faith litigation conduct included:

- Making false representations as to substance of evidence;

- Attempting to obtain discovery such as personal tax records, employee files, tax, and payroll information that it knew were not relevant to the coverage dispute and intended for a wrongful purpose;

- Failing to timely disclose witnesses and identify an "expert" without providing an "expert" report or even providing the opinion of the "expert" or the facts relied upon by the expert;

- Filing a knowingly baseless motion to transfer so as to attempt to delay the litigation;

- Unlawfully disclosing confidential communication made during mediations for an unlawful purpose; and

- Unlawfully filing an unaccepted offer of judgment with the Court for an unlawful purpose.

106.    Markel knew or should have known that its conduct during the litigation was and continues to be not based on debatably reasonable litigation conduct, and was so devoid of merit that it can only be viewed as asserted and maintained in bad faith and in breach of Markel's obligation of good faith and fair dealing owed to National Retail.

107.    Markel's litigation conduct demonstrated reckless indifference to the facts and the proofs submitted by National Retail.

**WHEREFORE**, National Retail demands judgment in its favor against Markel for compensatory damages, legal costs in the Coverage Litigation, putative damages, costs of suit, and such other relief as the Court deems just and proper.

20

**COUNT 4**
**Bad Faith Refusal to Pay Even the Amount Markel Concedes is Due Under The Policy.**

108.     National Retail incorporates herein by reference the proceeding paragraphs.

109.     While Markel's assertion that every stolen trailer was "waste" demonstrated reckless indifference to the facts and the proofs submitted by National Retail, even if that were the case, since Markel also asserts that the value of the trailers as "waste" is $82,270.45, the $82,270.45 is due and owing National Retail.

110.     Markel knew or should have known that its continuing failure to pay the $82,270.45 is a breach of Markel's obligation of good faith and fair dealing owed to National Retail and constitutes bad faith conduct.

111.     In failing to pay the $82,270.45, Markel demonstrated reckless indifference to the facts and the proofs submitted by National Retail.

**WHEREFORE**, National Retail demands judgment in its favor against Markel for compensatory damages, legal costs in the Coverage Litigation, putative damages, costs of suit, and such other relief as the Court deems just and proper.

**OFFIT KURMAN**

Attorneys for Plaintiffs

/s/Michael Conley
MICHAEL CONLEY, ESQ - BAR ID 54142
MEGHAN FINNERTY, ESQ. - BAR ID 202950
1801 Market Street, Suite 2300
Philadelphia, PA  19103
(267) 338-1317
mconley@offitkurman.com

Dated: March 28, 2022

21